ELLEN M. MAHAN
Deputy Section Chief
JAMES R. MacAYEAL
Trial Attorney
Environmental Enforcement Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 616-8777
E-mail: jamie.macayeal@usdoj.gov

DENNIS K. BURKE
United States Attorney
JANET K. MARTIN
Assistant United States Attorney
Arizona State Bar No. 6014
District of Arizona
405 W. Congress Street, Suite 4800
Tucson, AZ 85701-5040

Attorneys for Plaintiff United States

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| UNITED STATES,<br><br>Plaintiff,<br><br>v.<br><br>CALPORTLAND COMPANY, a<br><br>California Corporation,<br><br>Defendant. | Case No. 4:10-CV-00573-DCB<br><br><br>CONSENT DECREE |

## CONSENT DECREE

WHEREAS, the United States on behalf of the United States Environmental Protection Agency (the "United States") has filed a civil action against CalPortland Company, ("CPC") for civil penalties and injunctive relief based on alleged violations of the Clean Air Act ("CAA"), 42 U.S.C. § 7401 et seq., and the Air Implementation Plan for the State of Arizona approved by EPA pursuant to the CAA;

WHEREAS, the civil action relates to a cement manufacturing plant owned and operated by CPC in Rillito, Arizona (the "CPC facility");

WHEREAS, the United States alleges that the CPC facility has violated the CAA by commencing construction of a major modification project at the facility in 1998 ("RIMOD III") without the appropriate permit;

WHEREAS, this Consent Decree does not constitute any admission of liability on the part of CPC for any of the allegations raised by the United States in the Complaint;

WHEREAS, the parties have agreed that settlement of the civil claims alleged in the Complaint is in the public interest and that entry of this Consent Decree without further litigation is the most appropriate way to resolve the allegations in the Complaint;

WHEREAS, in December 2008, ADEQ issued a significant permit revision ("SPR 38592") to CalPortland's Title V permit, ADEQ Permit No. M190310P1-00 (the "Title V Permit"), to authorize construction of a new cement kiln with a maximum clinker production capacity of 2,300,000 tons per year and related facility modifications ("Kiln 6 Project");

NOW, THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED as follows:

## I. JURISDICTION, VENUE AND PARTIES BOUND

1. This Court has jurisdiction over the subject matter of this action and the parties pursuant to 28 U.S.C. §§ 1331, 1345, 1355, and 42 U.S.C. § 7413(b).

2. Venue is proper in the District of Arizona pursuant to 28 U.S.C. §§ 1391(b) and 1395 and 42 U.S.C. § 7413(b).

3. Notice of the commencement of this action has been given to the State of Arizona.

4. CPC consents to and shall not challenge entry of this Consent Decree nor shall CPC challenge this Court's jurisdiction to enter, enforce, modify, or terminate this Consent Decree.

5. This Consent Decree shall apply to and be binding upon CPC and its successors, and assigns, and upon the United States.

6. If CPC conveys the CPC facility or transfers a lease interest in the CPC

3

facility to a nonaffiliated third-party, or if CPC contracts with a non-affiliated third-party to operate all or part of the CPC facility on CPC's behalf, CPC shall give written notice of this Consent Decree to any successor in interest or any contract operator before executing such conveyance or contract. CPC shall send a copy of such written notification to the United States prior to the closing of such conveyance, transfer or operator agreement, and CPC shall attach a copy of this Consent Decree to any final agreement executed with such non-affiliated third-party. Transfer of CPC's ownership of the CPC facility or its lease interest in the CPC facility, or any contract with a non-affiliated third-party, will not relieve CPC from any obligation in the Consent Decree, or the payment of civil or stipulated penalties required under this Consent Decree.

## II. DEFINITIONS

7. Unless otherwise expressly provided herein, terms used in this Consent Decree which are defined in the CAA, in regulations promulgated thereunder shall have the meaning assigned to them in the statutes or in such regulations. Whenever terms listed below are used in this Consent Decree or in the appendices attached hereto and incorporated hereunder, the following definitions shall apply:

"CAA" shall mean the Clean Air Act, as amended, 42 U.S.C. § 7401 et seq.,

"Consent Decree" shall mean this Decree and all exhibits and appendices attached hereto.  In the event of conflict between this Decree and any appendix, this Decree shall control.

"Day" shall mean a calendar day unless expressly stated to be a working day.

"Effective Date" shall be the date of entry of this Consent Decree by the Court.

"EPA" shall mean the United States Environmental Protection Agency and any successor departments or agencies of the United States.

"Force majeure" shall mean any event that arises from causes beyond the control of CPC, of any of CPC's agents, contractors, consultants or any other entity within the control of CPC that delays or prevents the performance of any obligation under this Consent Decree despite CPC's Best efforts to fulfill the obligation.  "Best efforts" includes anticipating any potential force majeure event and addressing the effects of any such event (a) as it is occurring and (b) after it has occurred, to prevent or minimize any resulting delay to the greatest extent possible.  "Force Majeure" does not include CPC's financial inability to perform any obligation under this Consent Decree.

"Interest" shall mean the statutory rate applicable to judgments, 28 U.S.C. § 1961.

"Malfunction" shall mean, as that term is defined under 40 C.F.R. § 60.2, "any sudden, infrequent, and not reasonably preventable failure of air pollution control

equipment, process equipment, or a process to operate in a normal or usual manner.  Failures that are caused in part by poor maintenance or careless operations are not malfunctions."

"Paragraph" shall mean a portion of this Consent Decree identified by an Arabic numeral or an upper case letter.

"Parties" shall mean the United States and CPC.

"Plaintiff" shall mean the United States.

"Section" means a portion of this Consent Decree identified by a roman numeral.

"Shutdown" shall mean the cessation of operation of an affected source or portion of an affected source for any purpose and the surrender or relinquishment of all permits under the federal Clean Air Act relating to the operation of such source.

"SIP" shall mean the Arizona State Implementation Plan as approved by EPA under the Clean Air Act.

"Start-up" in reference to Kiln 6 shall mean the setting in operation of Kiln 6 for the purpose of producing clinker.

"Title V Permit" shall mean ADEQ Permit No. M190310P1-00 and all attachments and appendices thereto.

"United States" shall mean the United States of America, including all of its departments, agencies, and instrumentalities, which includes without limitation EPA, the Settling Federal Agencies and any federal natural resources trustee.

"Working day" shall mean a day other than a Saturday, Sunday, or Federal holiday.  In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or Federal holiday, the period shall run until the close of business of the next working day.

## III. INJUNCTIVE RELIEF

CPC shall comply with the following requirements:

8.  Notification of Compliance Option Election:  By the later of  May 16, 2010 or thirty (30) days from the Effective Date, CPC shall notify EPA, in accordance with Section XI (Notification), of its decision as to which compliance option, as specified in Paragraphs 9 and 10, it has elected.

9.  Option 1 –Kiln 6 Project

a.  If CPC elects to proceed with construction of Kiln 6, it shall comply with the requirements contained in SPR 38592, issued December 16, 2008, which authorizes construction and operation of Kiln 6.  Construction of Kiln 6 shall be completed within a reasonable time not to exceed forty-two (42) months from the date of the notice provided under Paragraph 8.

b.  If CPC elects to proceed with construction of Kiln 6, CPC shall

not produce clinker from Kilns 1, 2, 3 or 4 and shall permanently Shutdown and cease to operate Kilns 1, 2, 3, and 4 by no later than 6 months from the date that Kiln 6 commences operation.  CPC shall also amend any applicable permits so as to reflect the permanent Shutdown status of Kilns 1, 2, 3, and 4.

   c.  Treatment of Emission Reductions:  CPC shall not generate or use any PM emission reductions that result from Option 1 as netting reductions, emission offset credits, or reductions to lower any net emissions increase, in any PSD, major non-attainment and/or minor New Source Review permit or permit proceeding involving construction not required by this Consent Decree.

  10.  Option 2 - Installation and operation of controls.

   a.  If CPC elects not to construct Kiln 6 by the deadline set forth in this Consent Decree, CPC shall, within sixty (60) days of the election, submit to ADEQ's consolidated permitting program complete applications, amendments, and/or supplements to ensure that the emission limits and requirements set forth in Exhibit A to this Consent Decree are incorporated into federally enforceable minor or major new source review permits or other permits that will ensure that these underlying emission limits and requirements survive the termination of this Consent Decree.  Following submission of the complete permit applications CPC will cooperate with ADEQ by promptly submitting to ADEQ information that it seeks following its receipt of the permit materials.

b.  If CPC elects not to construct Kiln 6, CPC shall within sixty (60) days of making its election to proceed with Option 2, implement an Advanced Process Control System, as described in Exhibit B of this Consent Decree, which is attached hereto and incorporated by reference into this Decree, subject to any applicable permitting requirements set by the Arizona Department of Environmental Quality.

c.  Upon issuance of such permits or in conjunction with such permitting, CPC will file any applications necessary to incorporate the requirements of those permits into the Title V permit.  Using the procedures set forth in Section XI (Notification), CPC shall provide EPA with a copy of each application for a federally enforceable permit necessary to implement the requirements of this Consent Decree that is filed after the Effective Date, as well as a copy of any permit proposed as a result of such application, to allow for timely participation in any public comment opportunity.  If, as of the Effective Date, CPC has received any permit necessary to implement the requirements of this Consent Decree, then no later than thirty (30) days after the Effective Date, CPC shall submit copies of such permits to EPA using the procedures set forth in Section XI (Notification).  EPA may excuse in writing all or part of the latter submission if copies of such permits have already been submitted to EPA prior to the Effective Date.

d.  CPC's permit application(s) for Option 2 under the Arizona SIP shall only seek authorization for Option 2 and no other project, physical change or change in the method of operation.

e.  Treatment of Emission Reductions:  CPC shall not generate or use any PM emission reductions that result from Option 2 as netting reductions, emission offset credits, or reductions to lower any net emissions increase, in any PSD, major non-attainment and/or minor New Source Review permit or permit proceeding involving construction not required by this Consent Decree.

11.  If CPC chooses Option 2, it shall pay a supplemental penalty of $10,000 per month for every month (including any part of a month) after the effective date of this Consent Decree until such time as CPC notifies, pursuant to Section XI (Notification), the United States that the requirements of Exhibit A have been incorporated into the Title V Permit.  Such penalty shall be determined and paid within thirty (30) days of CPC's notification regarding the incorporation of the requirements of Exhibit A into the Title V Permit, subject to the same requirements and paid in the same manner as set forth in Section IV. (Civil Penalty) of this Consent Decree.  Such supplemental penalty shall not accrue during any month (including any part of a month) that ADEQ is processing CPC's permit application or CPC is awaiting an approval from the United States.  A disagreement between the United States and CPC concerning the amount of the supplemental penalty

shall be subject to Dispute Resolution under Section X (Dispute Resolution).

### IV. CIVIL PENALTY

12.   Within thirty (30) days after the Effective Date of this Consent Decree, CPC shall pay a civil penalty of three hundred fifty thousand dollars ($350,000) to the United States.  If payment is not made within thirty (30) days, in addition to the civil penalty, CPC shall pay interest accruing as of thirty (30) days after the Effective Date of the Consent Decree through the date of payment.

13.   Payments under this Consent Decree to the United States shall be made by Electronic Fund Transfer ("EFT") to the U.S. Treasury according to current United States EFT procedures.  Prior to making any payments, CPC shall request current EFT procedures from the Financial Litigation Unit of the U.S. Attorney's Office for the District of Arizona.  Concurrently with the EFT, CPC shall fax notice of payment to the person designated as "Point of Contact" on the EFT transfer instructions, and shall send notice of payment to EPA and the United States Department of Justice ("DOJ") at the addresses listed in Section XI (Notification) of this Consent Decree.  The notice of payment shall identify:  (1) the date and amount of money transferred; (2) the name and address of the transferring bank; (3) this case by name; (4) the civil action number; (5) DOJ # 90-5-2-1-08306; (6) this Consent Decree (including the Effective Date); and (7) a description of the reason for the payment (including the paragraph number of this

Consent Decree that is most relevant to the payment).

## V.  PERIODIC REPORTING

14.  Beginning thirty (30) days after the end of the second full calendar quarter following the entry of this Consent Decree, and continuing on a semi-annual basis until termination of this Consent Decree, and in addition to any other express reporting requirement in this Consent Decree, CPC shall submit to EPA a progress report.  The progress report shall contain the following information:

a.    all information necessary to determine compliance with this Consent Decree;

b.    all information indicating that the installation and commencement of operation for a pollution control device may be delayed, including the nature and cause of the delay, and any steps taken by CPC to mitigate such delay.

15.  In any periodic progress report submitted pursuant to this Section, CPC may incorporate by reference information previously submitted under its Title V permitting requirements, provided that CPC attaches the Title V permit report, or the relevant portion thereof, and provides a specific reference to the provisions of the Title V permit report that are responsive to the information required in the periodic progress report.

16.  In addition to the progress reports required pursuant to this Section,

CPC shall provide a written report to Plaintiffs of any violation of the requirements of this Consent Decree within fifteen (15) calendar days of when CPC knew or should have known of any such violation.  In this report, CPC shall explain the cause or causes of the violation and all measures taken or to be taken by CPC to prevent such violations in the future.

17.  Each CPC report shall be signed by a corporate official with management responsibility for the subject matter of the notice or report, and shall contain the following certification:

> This information was prepared either by me or under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted.  Based on my evaluation, or the direction and my inquiry of the person(s) who manage the system, or the person(s) directly responsible for gathering the information, I hereby certify under penalty of law that, to the best of my knowledge and belief, this information is true, accurate, and complete.  I understand that there are significant penalties for submitting false, inaccurate, or incomplete information to the United States.

## VI.  REVIEW AND APPROVAL OF SUBMITTALS

18.  CPC shall submit each air quality-related permit application, plan, report, or other submission required by this Decree to the Plaintiff, whenever such a document is required pursuant to this Consent Decree.

19.  Upon receipt of Plaintiff's final approval of the submittal, or upon completion of the submittal pursuant to dispute resolution, CPC shall implement the approved submittal in accordance with the schedule specified therein or another

EPA-approved schedule.

## VII. <u>STIPULATED PENALTIES</u>

20.  Subject to the Force Majeure provisions of this Consent Decree, CPC shall be liable for stipulated penalties for failure to comply with the terms and conditions of this Consent Decree as follows:

a.      Failure to pay the civil penalties set forth in Paragraph 11 and in Part VI (Civil Penalties): $ 5,000 per day.

b.      Failure to comply with the notification requirements in Paragraph 8:

| Penalty Per Day / Per Violation | Number of Days |
| --- | --- |
| $1,000 | 1 through 30 |
| $2,500 | Each day beyond 30 |

c.      If Option 1 is chosen, failure to comply with any of the daily rolling 365-day emissions caps for NOx, CO, or VOCs in SPR 38592, issued December 16, 2008:

i.      For each new day on which daily rolling 365-day emissions exceed the applicable emissions cap:  $1,000 per ton (or fraction of a ton) for the first 100 tons over the limit, and $5,000 per ton (or fraction of a ton) for each additional ton over the limit, up to $37,500 per violation per day.

ii.      A violation of any of the daily rolling 365-day emissions caps (NOx, CO, or VOCs) will occur when the level of emissions for the immediately preceding 365-day period exceeds the emissions cap.  For example, exceeding a

14

daily rolling 365-day emissions cap by 2.1 tons would result in a penalty of $3000.

    d.     If Option 1 is chosen, failure to comply with any milestone for completion of construction in Paragraph 9:

| Penalty Per Day / Per Violation | Number of Days |
| --- | --- |
| $1,000 | 1 through 30 |
| $2,500 | Each day beyond 30 |

    e.     If Option 1 is chosen, failure to comply with requirement to Shutdown Kilns 1-4 as specified in Paragraph 9b.:

| Penalty Per Day / Per Violation | Number of Days |
| --- | --- |
| $2,500 | 1 through 30 |
| $5,000 | Each day beyond 30 |

    f.     If Option 2 is chosen, unless the result of a Malfunction or event that qualifies as a Force Majeure event under Section IX (Force Majeure) and CPC has complied with the requirements of that section, failure to comply with emission limits in Exhibit A when they become effective.

| Penalty Per Day / Per Violation | Number of Days |
| --- | --- |
| $2,500 | 1 through 30 |
| $5,000 | Each day beyond 30 |

    g.  Failure to comply with any reporting or submittal requirement in this Consent Decree not otherwise specified:

| Penalty Per Day / Per Violation | Number of Days |
| --- | --- |
| $1,000 | 1 through 30 |

$2,500                                          Each day beyond 30

    h.  For any other violation of this Consent Decree, $1,000 per violation per day.

    Stipulated Penalties shall begin to accrue on the day after performance is due or on the day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases. Stipulated Penalties shall accrue simultaneously for separate violations of this Consent Decree.  Any stipulated penalty accruing pursuant to this Consent Decree shall be payable upon demand and due not later than thirty (30) days after CPC's receipt of EPA's written demand.  Such demand shall be sent by certified mail.

    21.  If CPC disputes the claimed violation, CPC may initiate the dispute resolution procedures set forth in this Consent Decree.  Otherwise, CPC shall pay the Stipulated Penalties.  Subject to Dispute Resolution procedures set forth in this Consent Decree, Interest shall accrue on unpaid Stipulated Penalties that are due and owing thirty (30) days after CPC's receipt of EPA's written demand. Stipulated penalties shall be paid in the same manner as payment of a civil penalty.

    22.  Payment of stipulated penalties for a violation of this Consent Decree shall be in addition to the right of the United States to seek other judicial or administrative relief for the violations that led to stipulated penalties.  In assessing penalties during any proceeding for other judicial or administrative relief, a court

or the United States may consider any payment of stipulated penalties already made by CPC.  In addition, the United States reserves its right to pursue any or all relief for any or all violations outside the purview of this Consent Decree.

23.  The United States may, in the unreviewable exercise of its discretion, reduce or waive Stipulated Penalties otherwise due under this Consent Decree.

24.  In the case of Dispute Resolution of Stipulated Penalties, the Stipulated Penalties need not be paid until the following:

a.      If the dispute is resolved by agreement or by a decision of EPA that is not appealed to the Court, CPC shall pay accrued penalties determined to be owing, together with Interest, within thirty (30) days of the effective date of the agreement or the receipt of EPA's decision or order.

b.      If the dispute is appealed to the Court and the United States prevails in whole or in part, CPC shall pay all accrued penalties determined by the Court to be owing, together with Interest, within sixty (60) days of receiving the Court's decision or order, except as provided in Subparagraph c, below.

c.      If any Party appeals the District Court's decision, CPC shall pay any and all accrued penalties determined to be owed, together with Interest, within fifteen (15) days of receiving the final appellate court decision requiring payment of stipulated penalties.

## VIII. <u>RIGHT OF ENTRY</u>

25.  EPA and its respective contractors, consultants, and agents shall have authority to inspect CPC's facility at all reasonable times, upon proper presentation of credentials.  This provision does not apply to areas not owned or under the control of CPC.  In addition, this provision in no way limits or otherwise affects any right of entry held by EPA pursuant to applicable federal, state, or local laws, regulations, or permits.

## IX. <u>FORCE MAJEURE</u>

26.  CPC shall satisfy the requirements of any injunctive relief except to the extent, and for the period of time, that such performance is prevented or delayed by events which constitute a force majeure, as defined above in Section II (Definitions).

27.  When a force majeure event occurs, the time for performance of the activity delayed by the force majeure shall be extended for the time period of the delay attributable to the force majeure.  The time for performance of any activity dependent on the delayed activity shall be similarly extended, except to the extent that the dependent activity can be implemented in a shorter time.  The United States, through EPA, shall determine whether dependent activities will be delayed by the force majeure and whether the time period should be extended for performance of such activities.  CPC shall adopt all reasonable measures to avoid

or minimize any delay caused by a force majeure.

28.   When an event occurs or has occurred that may delay or prevent the performance of any obligation under this Consent Decree, CPC shall provide written notification to the Chief, Air Enforcement Office, Air Division of EPA, Region 9, within twenty (20) days of CPC's knowledge of such event.  The written notification shall fully describe: the event that may delay or prevent performance; reasons for the delay; whether CPC claims that the delay resulted from an event which qualifies as a force majeure; the reasons any such delay is beyond the reasonable control of CPC; the anticipated duration of the delay; actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to mitigate the effect of the delay; and the time needed to implement any dependent activities.  For purposes of this Section, CPC will be deemed to have known of any circumstance that any of CPC's agents, contractors, consultants, or any other entity within the control of CPC, knew or should have known.

29.   CPC's failure to comply with the force majeure notice requirements provided herein for any delay in performance will be deemed an automatic forfeiture of its right to assert that the delay was caused by a force majeure.

30.   After receiving notice from CPC of a force majeure, the United States, through EPA, shall provide written notification to CPC stating whether it agrees

19

that there was a force majeure event and whether CPC's request for a delay is justified. If the United States does not respond to a request for a delay within thirty (30) days, the failure to respond may be treated by CPC as a denial of the request. If CPC disagrees with the United States' force majeure determination, CPC may initiate dispute resolution as set forth in this Consent Decree.

## X. DISPUTE RESOLUTION

31.  Unless otherwise expressly provided for in this Consent Decree, the Dispute Resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree. With respect to any dispute or allegation expressly raised by the United States concerning CPC's compliance with the Consent Decree,  CPC's failure to seek resolution of a dispute under this Section shall preclude CPC from raising any such issue as a defense to an action by the United States to enforce any obligation of CPC arising under this Consent Decree.

32.  Informal Dispute Resolution.  Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when a written Notice of Dispute is sent. Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed thirty (30) days from the date the dispute arises, unless that period is modified by written agreement. If the

Parties cannot resolve a dispute by informal negotiations, then the position advanced by the United States shall be considered binding unless, within thirty (30) days after the conclusion of the informal negotiation period, CPC invokes formal Dispute Resolution procedures as set forth below.

33.   Formal Dispute Resolution.   CPC shall invoke formal Dispute Resolution procedures, within the time period provided in the preceding Paragraph, by serving on the United States a written Statement of Position regarding the matter in dispute.   The Statement of Position shall include, but may not necessarily be limited to, any factual data, analysis, or opinion supporting CPC's position and any supporting documentation relied upon by CPC.

34.   The United States shall serve its Statement of Position within forty-five (45) days of receipt of CPC's Statement of Position.   The Statements of Position of the United States shall include, but may not necessarily be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the United States.   The United States' Statement of Position shall be binding on CPC, unless CPC files a motion for judicial review of the dispute in accordance with the following Paragraph.

35.   CPC may seek judicial review of the dispute by filing with the Court and serving on the United States, in accordance with the Notice provisions of this Consent Decree, a motion requesting judicial resolution of the dispute.   The motion

must be filed within thirty (30) days of receipt of the United States' Statement of

Position pursuant to the preceding Paragraph.  The motion shall contain a written

statement of CPC's position on the matter in dispute, including any supporting

factual data, analysis, opinion, or documentation, and shall set forth the relief

requested and any schedule within which the dispute must be resolved for orderly

implementation of the Consent Decree.

36.  The United States shall respond to CPC's motion within the time period

allowed by the Local Rules of this Court.  CPC may file a reply memorandum, to

the extent permitted by the Local Rules.

37.  In any dispute CPC shall bear the burden of demonstrating that its

position complies with this Consent Decree and that CPC is entitled to relief under

applicable law.  The United States reserves the right to argue that its position is

reviewable only on the administrative record and must be upheld unless arbitrary

and capricious or otherwise not in accordance with law.

38.  The invocation of Dispute Resolution procedures under this Section

shall not, by itself, extend, postpone, or affect in any way any obligation of CPC

under this Consent Decree, unless and until the Court so orders.  Stipulated

Penalties with respect to the disputed matter shall continue to accrue from the first

day of noncompliance, but payment shall be stayed pending resolution of the

dispute.  If CPC does not prevail on the disputed issue, Stipulated Penalties shall

be assessed and paid as provided in this Consent Decree.

## XI.  NOTIFICATION

39.  Except as otherwise specifically stated herein, all notices and submissions required by this Consent Decree shall be sent by certified mail, express mail, or similar overnight mail delivery service with return receipt requested.

40.  All notices and reports by CPC shall be signed and affirmed by a corporate official with management responsibility for the subject matter of the notice or report, using the following certification:

> I certify that this information was prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information to be submitted.  Based on my directions and my inquiry of those individuals immediately responsible for obtaining the information to be submitted, I certify that the information is true, accurate, and complete to the best of my knowledge, information, and belief.  I am aware that there are significant penalties for submitting false information, including the possibility of fines and imprisonment.

All notices and reports submitted to EPA or DOJ shall refer to this Consent Decree and the date of entry of the Consent Decree, and shall cite the case name of United States v. CalPortland Company, the case number, and DOJ #.

41.  Notices and reports to the United States as required by this Consent Decree shall be submitted to:

if by regular mail or post office express mail:

Chief, Environmental Enforcement Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044 7611

if by private overnight mail service:

Chief, Environmental Enforcement Section
Environment & Natural Resources Division
United States Department of Justice
1425 New York Avenue, 13th Floor
Washington, D.C. 20005

and to:

Kara Christenson (ORC-2)
U.S. Environmental Protection Agency
75 Hawthorne Street
San Francisco, CA 94105

Director, Air Division
U.S. Environmental Protection Agency
75 Hawthorne Street
San Francisco, CA 94105
Attn: Charles Aldred (AIR-5)

Director, Air Enforcement Division
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Mail Code: 2242A
Washington, DC 20460

24

Notices to CPC as required by this Consent Decree shall be submitted to:

David N. Bittel
Plant Manager
CalPortland Company
11115 Casa Grande Highway
Rillito, AZ 85654

John Renninger
General Counsel
CalPortland Company
2025 East Financial Way
Glendora, CA 91740

Albert H. Acken
Lewis and Roca LLP
40 N. Central Avenue, Suite 1900
Phoenix, AZ 85004-4429

## XII. EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

42. Entry of this Consent Decree and compliance with the requirements herein shall resolve and shall be in full settlement and satisfaction of the civil claims of the United States against CPC as alleged in the Finding and Notice of Violation, dated June 11, 2003, and the Complaint filed in this action through the lodging of this Consent Decree.

43. Except as specifically provided herein, the United States does not waive any rights or remedies available to it for violation by CPC of federal or state laws or regulations. This Consent Decree shall in no way affect the United States' ability to bring future actions for any claims not alleged in the Complaint or the

Finding and Notice of Violation, dated June 11, 2003, in this case or for claims subject to an express reservation.  This Consent Decree does not relieve CPC of any criminal liability.

44.  This Consent Decree in no way affects CPC's responsibilities to comply with all federal, state, or local laws and regulations.

45.  This Consent Decree does not limit or affect the rights of CPC or of the United States against any third parties, not party to this Consent Decree, nor does it limit the rights of third parties, not parties to this Consent Decree, against CPC, except as otherwise provided by law.  This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

## XIII. COSTS

46.  The Parties shall bear their own costs of this action, including attorneys' fees.

## XIV. TERMINATION

47.  If Kiln 6 is constructed pursuant to this Consent Decree, this Consent Decree shall terminate one year from the date Kiln 6 begins operation, provided that CPC has completed and satisfied all of the following requirements of this Consent Decree and the termination procedure set forth below:

a.      completion of the injunctive relief specified in this Consent Decree;

and

     b.     payment of all penalties and other monetary obligations due under the terms of this Consent Decree.

     When CPC believes that it has satisfied the requirements for termination set forth above, CPC shall certify such compliance and completion to the United States in writing.  Unless, within sixty (60) days of receipt of CPC's certification, the United States objects in writing with specific reasons, the Court may upon motion by CPC order that this Consent Decree be terminated.  If the United States objects to the certification by CPC, then the matter shall be submitted to the Court for resolution under the dispute resolution provisions of this Consent Decree.  In such case, CPC shall bear the burden of proving that this Consent Decree should be terminated.

     48.  If Kiln 6 is not constructed pursuant to this Consent Decree, this Consent Decree shall terminate three years from completion of measures required under Paragraphs 10 and 11, provided that CPC has completed and satisfied all of the following requirements of this Consent Decree and the termination procedure set forth below:

     a.     completion of the injunctive relief specified in this Consent Decree, except with respect to continuing obligations of injunctive relief specified in this Consent Decree;

b.    completion of incorporation of the emission limits and requirements in Exhibit A of this Consent Decree into federally enforceable minor or major new source review permits or other permits and into a Title V permit that will ensure that these underlying emission limits and requirements survive termination of this Consent Decree; and

c.    payment of all penalties and other monetary obligations due under the terms of this Consent Decree.

When CPC believes that it has satisfied the requirements for termination set forth above, CPC shall certify such compliance and completion to the United States in writing.  Unless, within sixty (60) days of receipt of CPC's certification, the United States objects in writing with specific reasons, the Court may upon motion by CPC order that this Consent Decree be terminated.  If the United States objects to the certification by CPC, then the matter shall be submitted to the Court for resolution under the dispute resolution provisions of this Consent Decree.  In such case, CPC shall bear the burden of proving that this Consent Decree should be terminated.

## XV. MISCELLANEOUS

49.  This Consent Decree contains the entire agreement between the parties. This Consent Decree may not be enlarged, modified, or altered unless such modifications are made in writing and approved by all parties and the Court.

50. The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court.

51. The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of resolving disputes arising under this Consent Decree or entering orders modifying this Consent Decree or effectuating or enforcing compliance with the terms of this Consent Decree.

52. The parties represent that each undersigned signatory signing on their behalf has full authority to sign the Consent Decree and to bind said party to the terms and conditions of the Consent Decree.

53. CPC agrees and acknowledges that final approval of this Consent Decree by the United States and entry of this Consent Decree is subject to the requirements of 28 C.F.R. § 50.7, which provides for notice of the lodging of this Consent Decree in the Federal Register, opportunity for public comment for at least thirty (30) days, and consideration of any comments prior to entry of the Consent Decree by the Court. The United States reserves the right to withdraw consent to this Consent Decree based on comments received during the public notice period. CPC consents to entry of this Consent Decree without further notice to the Court. Upon approval and entry, this Consent Decree shall constitute a final judgment under Rules 54 and 58 of the Federal Rules of Civil Procedure.

IT IS SO ORDERED

DATED this _____ day of _____, 2010.


_____
UNITED STATES DISTRICT JUDGE

Signature page for Consent Decree in *United States v. CalPortland Company*

FOR THE PLAINTIF UNITED STATES OF AMERICA:

Date: 8/26/10

ELLEN M. MAHAN
Deputy Section Chief
Environmental Enforcement Section
United States Department of Justice

Date: 8/26/10

JAMES R. MacAYEAL
Trial Attorney
Environmental Enforcement Section
Environment & Natural Resources   Division
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611

Signature page for *Consent Decree in United States v. CalPortland Company* consent decree

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:

DATE: 8/3/10

_____
CYNTHIA GILES
Assistant Administrator
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency

DATE: 7/27/10

_____
ADAM M. KUSHNER
Office Director
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency

DATE: 7/20/10

_____
PHILLIP A. BROOKS
Division Director
Air Enforcement Division
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency

DATE: 7/20/10

_____
TAHANI ANN RIVERS
Staff Attorney
Air Enforcement Division
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency

Signature page for *Consent Decree in United States v. CalPortland Company* consent decree

DATE: _____

_____

JARED BLUMENFELD
Regional Administrator
United States Environmental Protection Agency
Region 9

Of Counsel:
KARA CHRISTENSON
Senior Counsel
Office of Regional Counsel
United States Environmental Protection Agency Region 9
75 Hawthorne Street
San Francisco, CA  94105
christenson.kara@epa.gov
415 972-3881

Signature page for *Consent Decree in United States v. CalPortland Company* consent decree

FOR THE DEFENDANT CALPORTLAND COMPANY:

DATE : _4-1-10_

_____
RICK PATTON
Senior Vice President
CalPortland Company

Exhibit A to Consent Decree

Compliance Plan and Permit Language for Option 2

Attachment F:

Air Quality Control Permit No. M190310P1-00

for CalPortland Company – Rillito Cement Plant

## I.   General Provisions

A. Any new or modified equipment necessary to meet the conditions of this Attachment shall be installed within ten (10) months of permit issuance.

  1. If Kilns 1, 2, and 3 are not operating on the date of permit issuance, then the upgrade of dust collector H5-5-GB, necessary to comply with condition VI.C of this attachment, must be installed no later than one hundred and eighty (180) days from the date of the startup of Kilns 1, 2, or 3.

  2. If CPC does not restart Kilns 1, 2 and 3, and decides to permanently shut down and cease operation of Kilns 1, 2, and 3, CPC is not required to install the upgrade of dust collector H5-5-GB.  CPC shall notify EPA of its decision to permanently shut down and cease operation of any kiln and amend all applicable permits to reflect the permanent shutdown status.

  3. Except for Option 1, this Consent Decree shall not be construed to require CPC to shutdown Kilns 1, 2, 3 or 4.

B. The emission limits and control measures contained in this Attachment become effective when the applicable equipment becomes operational.  Each new and modified unit listed herein becomes operational after a reasonable shakedown period, not to exceed 180 days after installation.

## II.   Low-Grade and High-Grade Limestone Storage Piles

A. Applicability

This Section applies to the low-grade and high-grade limestone storage piles located at the Cement Plant. It does not apply to storage piles located at the Quarry.

B. Emission Limits/Standards

Permittee shall not cause or allow visible emissions from low-grade and high-grade limestone storage piles in excess of 20% opacity.

C. Control Measures

Permittee shall apply dust suppressants such as water or chemical stabilizers as needed to comply with the emission limits in Part II(B).

D. Performance Tests

Permittee shall conduct performance tests annually to determine compliance with the emission limits in Part II(B) in accordance with EPA Reference Method 9 of 40 CFR Part 60, Appendix A.

**III.    New Raw Mix Additive Mill Feed Hopper**

A. Applicability

This Section applies to the new raw mix additive mill feed hopper, Equipment ID#D4-HOP.

B. Emission Limits/Standards

Permittee shall not cause or allow visible emissions from the new raw mix additive mill feed hopper in excess of 10% opacity.

C. Control Measures

1. When the hopper is in use, permittee shall use watersprays as needed to comply with the emission limits in Part III(B).

2. Permittee shall inspect the water spray system annually to ensure proper operation.

D. Performance Tests

Permittee shall conduct performance tests annually to determine compliance with the emission limits in Part III(B) in accordance with EPA Reference Method 9 of 40 CFR Part 60, Appendix A.

IV. **New Raw Mix Mill Rejects Bin**

A. Applicability

This Section applies to the new raw mix mill rejects bin, Equipment ID#D4-SB1.

B. Emission Limits/Standards

Permittee shall not cause or allow visible emissions from the new raw mix mill rejects bin in excess of 20% opacity.

C. Control Measures

1. The raw mix mill rejects bin shall be in an enclosed bin which is controlled through the raw mill system.

2. Permittee shall inspect the bin enclosure and associated control systems for leaks and malfunctions during planned, periodic maintenance.

D. Performance Tests

Permittee shall conduct performance tests annually to determine compliance with the emission limits in Part IV(B) in accordance with EPA Reference Method 9 of 40 CFR Part 60, Appendix A.

## V.   D2 Finish Mill Baghouse

### A.  Applicability

This Section applies to dust collector D2-1-DC1, which serves the D2 Finish Mill, Equipment ID# D2-1-M.

### B.  Control Measures

Permittee shall operate dust collector D2-1-DC1 to control PM10 emissions from the D2 Finish Mill.

### C.  Emission Limits/Standards

Permittee shall not cause or allow emissions which contain PM10 in excess of 0.005 gr/dscf from dust collector D2-1-DC1.

### D.  Monitoring

1. Permittee shall install, calibrate, maintain, and operate a Bag Leak Detection System for detecting leaks in dust collector D2-1-DC1.  This condition is not material, as defined in Arizona Administrative Code R18-2-331 and Arizona Revised Statutes section 49-464(G), in the event failure to comply is due to a sudden and unavoidable breakdown of the process or the control equipment, resulted from unavoidable conditions during a startup or shutdown, or resulted from upset of operations.

2. The Bag Leak Detection System required by Condition V.D.1 shall meet the requirements of Conditions V.D.2.a through V.D.2.i:

a.  The Bag Leak Detection System must be certified by the manufacturer to be capable of detecting PM emissions at concentrations of 0.0044 grains per actual cubic foot or less. "Certify" shall mean that the instrument manufacturer has tested the instrument on gas streams having a range of particle size distributions and confirmed by means of valid filterable PM tests that the minimum detectable concentration limit is 0.0044 grains per actual cubic foot or less.

b.  The sensor on the Bag Leak Detection System must provide output of relative PM emissions.

c.  The Bag Leak Detection System must have an alarm that will activate automatically when it detects a significant increase in relative PM emissions greater than a preset level.

d.  The presence of an alarm condition should be clearly apparent to facility operating personnel.

e.  For a positive-pressure fabric filter, each compartment or cell must have a bag leak detector. For a negative-pressure or induced-air fabric filter, the bag leak detector must be installed downstream of the fabric filter.  If multiple bag leak detectors are required (for either type of fabric filter), detectors may share the system instrumentation and alarm.

f.  The Bag Leak Detection System must be installed, operated, adjusted, and maintained so that it is based on the manufacturer's written specifications and recommendations.

g.  The baseline output of the Bag Leak Detection System must be established as follows:

  i.  Adjust the range and the averaging period of the device; and
  ii.  Establish the alarm set points and the alarm delay time.

h. After initial adjustment, the range, averaging period, alarm set points, or alarm delay time may not be adjusted except as specified in the operations and maintenance plan.  In no event may the range be increased by more than 100 percent or decreased by more than 50 percent over a 1 calendar year period unless the Permittee certifies in writing to the Director that the Dust Collector has been inspected and found to be in good operating condition.

i. Permittee must maintain and operate the fabric filter such that the bag leak detector alarm is not activated and alarm condition does not exist for more than 5 percent of the total operating time in a 6-month block period. Each time the alarm activates, alarm time will be counted as the actual amount of time taken by the owner or operator to initiate corrective actions. If inspection of the fabric filter demonstrates that no corrective actions are necessary, no alarm time will be counted. Permittee shall continuously record the output from the Bag Leak Detection System during periods of normal operation.  Normal operation does not include periods when the Bag Leak Detection System is being maintained or during startup, shutdown or malfunction.

## VI.   Kiln Baghouses

### A. Applicability

This Section applies to dust collectors (currently H5-GB and H5-5-GB), which control PM10 in the combustion exhaust emissions from kilns 1 through 4.

### B. Control Measures

Permittee shall operate the dust collectors to control PM10 emissions from the kilns.

### C. Emission Limits/Standards

Permittee shall not cause or allow emissions which contain PM10 in excess of 0.008 gr/dscf from the dust collectors.

D. Performance Tests

Permittee shall conduct performance tests annually to determine compliance with the emission limit in Section VI.C. in accordance with EPA Reference Method 5 or Method 201a.

## VII.  Other Dust Collectors

A. Applicability

This section applies to the following dust collectors that were installed or modified during RIMOD III or serve equipment that were installed or modified during RIMOD III: C2-DC2; C2-DC3; C2-DC4; C2-DC5; C2-DC6; C2-DC7; C2-DC8; C2-DC9; C2-DC10; C2-DC11; C2-DC12; C2-DC13; D2-DC1; D2-DC3; D2-DC4; F2-DC1; F2-DC4; D4-DC1; D4-DC2; AC-DC1; CM-DC17

B. Control Measures
Permittee shall operate the dust collectors subject to this Section to control PM10 emissions from associated process equipment.

C. Emission Limits/Standards

Permittee shall not cause or allow emissions which contain PM10 in excess of 0.005 gr/dscf from any dust collector listed in Part VII(A).

D. Performance Tests

1. Permittee shall conduct a monthly 1-minute visible emission test of each dust collector in this Section in accordance with EPA Reference Method 22 of Appendix A to 40 CFR Part 60.

2. If visible emissions are observed an investigation of the dust collector will be initiated within 24 hours to determine if there is a need for corrective action. If corrective action is required, it shall be implemented as soon as practicable in order to advert or minimize any possible exceedences of the emission limit.

3. If no visible emissions are observed in six consecutive monthly tests, the testing frequency may be reduced from monthly to a semi-annual test. If visible emissions are observed during any semi-annual test, the visible emission testing will revert back to monthly testing until no visible emissions are observed in six consecutive monthly tests.

4. If no emissions are observed during the semi-annual test, the testing frequency may be reduced from semi-annual to an annual test. If visible emissions are observed during any annual test, the visible emission testing will revert back to monthly testing until no visible emissions are observed in six consecutive monthly tests.

5. If visible emissions are observed during any EPA Reference Method 22 test, Permittee shall conduct a 6-minute test of opacity in accordance with EPA Reference Method 9 of Appendix A to 40 CFR Part 60. The EPA Reference Method 9 test shall begin within one hour of any observation of visible emissions.

Exhibit B to Consent Decree

## I. Advanced Process Control System

**A. Definition**

Advanced Process Control System is kiln process secondary control software that uses a Model Predictive Control, Rule Based Control, Fuzzy Logic Control or a combination of these systems to develop an Advanced Kiln Process Control System.

**B. Purchase and Installation**

1. Except as provided in subparagraph B.1.a. below, if CPC elects not to construct Kiln 6, CPC shall within sixty (60) days of making its election to proceed with Option 2, purchase for installation and operation on Kilns 1, 2, 3, and 4, Advanced Process Control System software for each kiln. The Advanced Process Control System(s) shall be installed within four (4) months of delivery of the software but no later than 180 days from the date of notification under Paragraph 8 of the Consent Decree.

   a. At the time of its election to proceed with Option 2, CPC may have temporarily or otherwise suspended operation of Kilns 1, 2, or 3. Within ten (10) days of restart of any kiln, CPC shall provide EPA with notification of the restart. Further, CPC shall purchase for installation and operation an Advanced Process Control System for the restarted kiln within 60 days of the restart. In addition, CPC shall install the Advanced Process Control System within four (4) months of delivery of the software but no later than 180 days from the date of kiln restart.

2. CPC shall notify ADEQ and EPA of its decision to permanently shut down and cease operation of a kiln and amend any applicable permits to reflect the permanent shutdown status. Except for Option 1, this Consent Decree shall not be construed to require CPC to shutdown Kilns 1, 2, 3, or 4.

43

3.   CPC shall continuously operate the Advanced Process Control System on any kiln on which it is installed at least until July 15, 2013.

C.  Operation

After the initial installation of the Advanced Process Control System, CPC shall run the software while the kilns are operating, except that the software is not required to be running during events of malfunction (including malfunction of the software), breakdown of process or control equipment, or upset of operations or during periods of startup or shutdown.

D.  Initial Notifications and Reporting

1.  Within ten (10) days of purchase, CPC shall notify ADEQ and EPA of the date of purchase and the manufacturer, software name, and version number of the Advanced Process Control System software.

2.  Within ten (10) days of initial installation of the Advanced Process Control System software on each kiln, CPC shall notify ADEQ and EPA of the date of initial installation and the kiln affected.

3.  Within fifteen (15) days of the end of each calendar quarter following purchase, CPC shall submit to ADEQ and EPA a report for each kiln identifying each period of non-operation of the Advanced Process Control System when the respective kilns were in operation.  The report shall include, for each such period of non-operation, the following information:  date, duration, kiln affected, reason for non-operation; and measures taken and length of time required to address the problem.

4.  Within fifteen (15) days of the end of the fourth calendar quarter following purchase, CPC shall submit to ADEQ and EPA a report that evaluates the effectiveness of the Advanced Process Control System software.  The report shall identify the manufacturer, software name and version number of the software; the hours operated; an evaluation of all benefits (fewer excess emissions/upset conditions, etc.) when compared with previous

44

twelve (12) month period; and an analysis if the software is determined to be ineffective.